UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Global Commodities, Inc.,

      Plaintiff,

v.

Capital Distributors LLC and Capital
Imports, LLC,

      Defendants.

File No. 24-CV-00216 (JMB/EMB)

**ORDER**

---

Austen P. Zuege, Westman, Champlin & Koehler, P.A., Minneapolis, MN; Thomas O'Rourke (*pro hac vice*), O'Rourke IP Law P.L.L.C., Melville, NY; and Michael Cukor (*pro hac vice*), McGeary Cukor, Phoenix, AZ, for Plaintiff Global Commodities, Inc.

Ruth A. Rivard, Stinson LLP, Minneapolis, MN; and Zachary T. Buchheit (*pro hac vice*), Stinson, LLP, St. Louis, MO, for Defendants Capital Distributors LLC and Capital Imports, LLC.

---

This matter is before the Court on Defendants Capital Distributors LLC and Capital Imports, LLC's (together, Capital) Motion for Summary Judgment (Doc. No. 128) and Capital's Motion to Strike and Exclude Undisclosed Evidence (Doc. No. 160). The Court grants the summary judgment motion because the record could not lead a reasonable juror to find in favor of Plaintiff Global Commodities, Inc. (Global).

## STATEMENT OF UNDISPUTED FACTS

In this trademark dispute, Global alleges that Capital infringes its property rights. Global owns two federally registered marks depicting fawns, Registration Nos. 3,966,152 and 3,239,488 (Fawn Marks). (Doc. No. 1 ¶¶ 1, 9, 14, 20–23; Doc. Nos. 1-2, 1-3.) For its

1

part, Capital owns a federally registered mark relevant to this dispute, Registration No. 5,926,738 (Impala Mark), which depicts "an impala design in black outline with black shading" and, "[a]bove the impala at top right," a "red partial outline of a heart design." (Doc. No. 132-4.)   Global alleges that the Impala Mark is infringing the federal and common law rights that Global has in its Fawn Marks.[1]  These marks are depicted below:

**Global's Fawn Marks:**

  

Reg. No. 3,966,152          Reg. No. 3,239,488

**Capital's Impala Mark:**



All three marks were registered for use with the product "rice."  (Doc. Nos. 1-2, 1-3, 132-4; *see also* Doc. No. 143-1 ¶ 26.)

---

[1] Color is not claimed as part of either of the Fawn Marks.  (Doc. Nos. 1-2, 1-3.)  The colors black and red are claimed as a feature of the Impala Mark.  (Doc. No. 132-4.)

### A. Global's AAHU BARAH Rice Brand

Global is a small family-run business founded in the United States by Abdul and Zarghouna Bakhtari in the 1990s. (Doc. No. 143-1 [hereinafter, "Z. Bakhtari Decl."] ¶¶ 16, 19; Doc. No. 136 [hereinafter, "N. Bakhtari Decl."] ¶ 5.) They worked hard to establish a market for basmati rice and other Afghani food products under the AAHU BARAH brand name. (Z. Bakhtari Decl. ¶¶ 14–18.) Abdul designed the Fawn Logos and chose the name AAHU BARAH, an Afghani phrase that translates to fawn, because he had fond memories of "spotting new born fawns in the rocky valleys where he grew up" and because the fawn is a popular animal in "Middle Asian countries and the beauty of the fawn's eye shape is noted in poetry, folk songs and modern Persian music." (*Id.* ¶¶ 13, 27–31.) When selecting the AAHU BARAH mark, they were not aware of any connection between a deer and basmati rice. (*Id.* ¶¶ 27, 30.)

Global has used the Fawn Marks in connection with selling basmati rice primarily to "the Middle Asian[2] and African" communities for at least 27 years. (*Id.* ¶¶ 1, 26.) Global obtained federal registration for the Fawn Marks in 2007 (Reg. No. '488) and 2011 (Reg. No. '152) based on alleged first use in commerce in 1997. (Doc. Nos. 1-2, 1-3.) Global sells basmati rice primarily in bags for larger quantities and plastic containers for smaller quantities, with additional packaging elements on each, as shown below:

---

[2] Global appears to use the term "Middle Asia" to refer to the countries Pakistan, Afghanistan, Iran, Tajikistan, and Uzbekistan. (*See* Z. Bakhtari Decl. ¶ 12.)



(Z. Bakhtari Decl. ¶¶ 49–52.)

Each of these packages prominently displays, in addition to one of the Fawn Marks, the AAHU BARAH word mark in an arc across the top of the bag or label and, in large type at the bottom of the packaging, the name and address of the importer (Global or, on the white bag, Rice Import USA, Inc.). (*Id.*)

Global has grown its market for AAHU BARAH rice, selling approximately 200,000–250,000 bags of AAHU BARAH rice, bearing the Fawn Marks, across the United States in each of the past five years. (N. Bakhtari Decl. ¶ 6.) Global sells this product through a variety of distribution channels: wholesalers, grocery stores, restaurants, and online retailers including major retailers, such as Amazon.com, as well as Global's own website. (*Id.* ¶¶ 5, 7.) Global markets its AAHU BARAH rice on Facebook, and many of its customers also promote the product on Facebook. (*Id.* ¶ 8.) Global has also spent money, in an unspecified amount on this record, on commercials for television and YouTube, Facebook, and Amazon advertisements, sponsorships for soccer tournaments, and promotions at trade shows. (*Id.* ¶¶ 9–11; Doc. No. 136-1 at 41–46.)

**B.    Capital's Al Afia Rice Brand**

Capital was a distributor of Global's AAHU BARAH rice for a number of years, until around 2020–2021.  (Z. Bakhtari Decl. ¶ 3; Doc. No. 129-1 at Exhibit 2 [hereinafter, "Osman TTAB Decl."] ¶¶ 5, 9; Doc. No. 159 ¶ 4.)  Capital sells rice to businesses, not directly to individual consumers.  (Osman TTAB Decl. ¶ 32.)  Capital primarily sold AAHU BARAH rice to the Afghani and Pakistani market.  (*Id.* ¶ 7.)

Around 2018, Capital began using the Impala Mark in connection with its sales of Al Afia rice.  (*Id.* ¶ 24.)  Capital primarily markets its rice "within the East African ethnic minority communities in Minnesota and neighboring states," under different brand names that include AL AFIA.  (*Id.* ¶ 32.)  Capital primarily markets this product through word of mouth and relationships via specialty grocery stores in the Twin Cities and through its Minnesota warehouse.  (*Id.* ¶¶ 33, 34.)

**C.    Procedural History**

Global brought its Complaint after the Trademark Trial and Appeal Board of the U.S. Patent and Trademark Office (TTAB) denied Global's petition to cancel Capital's Impala Mark registration in November 2023.  (Doc. No. 1 ¶ 1; *see also* Doc. No. 1-1.)  Capital moved for partial dismissal of the Complaint, and the Court granted the dismissal of three out of seven counts in the Complaint: Counts V (common law unfair competition), VI (common law trade dress infringement), and VII (statutory fraud under the Minnesota Deceptive Trade Practices Act).  (Doc. No. 33.)  In dismissing Count VI, the Court found that Global had not stated a claim for relief as to common law trade dress infringement

related to Global's and Capital's rice bags because Global had not identified the particular elements or attributes that comprise the alleged protectable trade dress. (*Id.* at 6–7.)

Under the Pretrial Scheduling Order, the deadline for moving to amend the pleadings was August 15, 2024. (Doc. No. 24 at 4.) After this deadline, Global moved to amend its Complaint, including to add allegations about common features of Global's and Capital's bags and proposing related edits to Count IV (a claim for trademark infringement of the "common law Fawn Image trademarks and the features of Plaintiff's bag" (Doc. No. 1 ¶ 41)) that would change the allegations about its "bag" to refer instead to a "label" on the bag. (Doc. No. 38 ¶¶ 36–46, 69–70.) The Court denied this motion on the basis that Global had not shown good cause to amend the Scheduling Order. (Doc. No. 43.)

Capital then moved for partial judgment on the pleadings on Count IV. (Doc. No. 112.) The Court granted that motion, finding that Global had not plausibly pleaded a claim for common law trademark infringement in its bag design, similar to its finding that Global had failed to state a claim for trade dress. (*See generally* Doc. No. 169.) The Court dismissed Count IV "to the extent based on trade dress." (*Id.* at 7.)

Global again moved to amend its Complaint and to extend the applicable deadline in the scheduling order to allow it to do so. (Doc. Nos. 170.) Again, Global sought to amend the allegations in Count IV to refer to a "label" instead of a "bag" and add, for the first time, allegations about the elements of the alleged common law bag-label-design trademark. (*See* Doc. No. 170-1 ¶ 41.) The Court denied leave to amend because Global failed to show good cause. (Doc. No. 183.)

Meanwhile, Capital moved for summary judgment, and the parties fully briefed the motion. (*See* Doc. Nos. 128, 131, 135, 156.) After Global filed its opposition brief, Capital filed a Motion to Strike concerning certain materials submitted with Global's summary judgment opposition brief. (Doc. No. 160.) Global opposes the Motion to Strike. (Doc. No. 167.) On January 13, 2026, the Court heard oral arguments on Capital's Motion for Summary Judgment and Motion to Strike.[3]

## DISCUSSION

Summary judgment should be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Frosty Treats Inc. v. Sony Computer Ent. Am. Inc.*, 426 F.3d 1001, 1003 (8th Cir. 2005). The Court must view the record in the light most favorable to the non-moving party and grant summary judgment if the moving party demonstrates that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Id.* Facts must be viewed in the light most favorable to the nonmoving party "only if there is a genuine dispute as to those facts," meaning that the nonmovant has come forward with "specific facts showing that there is a genuine issue for trial." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir.

---

[3] Although the motion to strike has some merit, the Court also acknowledges that at least some of the disputed evidence had been previously produced or was never specifically requested. In any event, the Court's decision to grant the summary judgment motion would be the same, even if the disputed evidence is included in the summary judgment record. Therefore, for purposes of the summary judgment motion, the Court presumes without deciding that the disputed evidence is properly in the record, and given the decision to grant the summary judgment motion, the Court denies the motion to strike as moot.

2011) (quotations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* (quotation omitted). If the record, taken as a whole, "could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (quotation omitted).

In evaluating the evidence at the summary judgment stage, the Court considers "only those responses that are supported by admissible evidence." *Duluth News-Trib., a Div. of Nw. Publ'ns, Inc. v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1098 (8th Cir. 1996) (quotation omitted). The proponent of the evidence at summary judgment has the burden of showing that evidence is either admissible as presented or may "explain the admissible form that is anticipated." Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 amendment; *see also* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). The TTAB's denial of Global's cancellation petition is reviewed de novo and is not limited to the evidence and arguments introduced at the TTAB. *See B & B Hardware, Inc. v. Hargis Indus.*, Inc., 575 U.S. 138, 144 (2015); 3 *McCarthy on Trademarks and Unfair Competition* § 21:21 (5th ed.) ("[W]hen new evidence is submitted in the district court, the court will conduct a de novo review of the *entire record*, including the evidence before the [TTAB] and the new evidence submitted on review." (emphasis in original)).

Capital moves for summary judgment on all of Global's remaining claims: (1) Count I, which seeks a review of the TTAB decision and an order cancelling Capital's Impala Mark registration pursuant to 15 U.S.C. §§ 1071(b)(1) and 1052(d); (2) Counts II

and III, which allege trademark infringement and false designation of origin concerning the Fawn Marks pursuant to 15 U.S.C. §§ 1114 and 1125(a); and (3) Count IV, which alleges trademark infringement of the Fawn Marks under Minnesota common law. As discussed below, because no reasonable juror could find a likelihood of confusion between the Fawn Marks and the Impala Mark on this record, the Court grants summary judgment in favor of Capital.[4]

"Trademarks are any word, name, symbol, or device . . . used by a person . . . to identify and distinguish his or her goods . . . from those manufactured or sold by others." *ZW USA, Inc. v. PWD Sys., LLC*, 889 F.3d 441, 445–46 (8th Cir. 2018) (quoting 15 U.S.C. § 1127). For claims under both 15 U.S.C. §§ 1114 and 1125(a), the plaintiff mark owner must show that the defendant's use of its mark "is likely to cause confusion *in the minds of consumers* about the origin of the goods or services in question." *Id.* at 446 (quoting *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 117 (2004)) (emphasis in original); *Davis v. Walt Disney Co.*, 430 F.3d 901, 903 (8th Cir. 2006); *see also Am. Dairy Queen Corp. v. W.B. Mason Co.*, 543 F. Supp. 3d 695, 712 (D. Minn. 2021) (applying this same framework to a common law trademark-infringement claim (citing *DaimlerChrysler AG v. Bloom*, 315 F.3d 932, 935 (8th Cir. 2003))).

---

[4] The Court does not address Capital's arguments for summary judgment on Global's claims as to the trade dress or bag label, as those claims are no longer viable in light of the Court's grant of Capital's motion to dismiss and motion for partial judgment on the pleadings and denial of Global's multiple motions seeking leave to amend to resuscitate those claims. (Doc. Nos. 43, 169, 183, 186.)

In the Eighth Circuit, courts evaluate six factors (*i.e.*, the *SquirtCo* factors) to determine the likelihood of confusion:

> (1) the strength of the owner's mark; (2) the similarity between the owner's mark and the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to "pass off" its goods as those of the trademark owner; (5) incidents of actual confusion; and (6) the type of product, its costs and conditions of purchase.

*ZW USA*, 889 F.3d at 446 (citing *SquirtCo v. Seven-UpCo.*, 628 F.2d 1086, 1091 (8th Cir. 1980) (quotation omitted)).

Courts may decide likelihood of confusion at the summary judgment stage. *E.g.*, *id.* at 448 (affirming summary judgment finding of no likelihood of confusion); *Davis*, 430 F.3d at 905–06 (affirming grant of summary judgment where the majority of the factors weighed against likelihood of confusion). Summary judgment is appropriate when a trademark dispute "centers on the proper interpretation to be given to the facts, rather than on the facts themselves." *Duluth News-Trib.*, 84 F.3d at 1099 (granting the defendant's summary judgment motion on a trademark claim). Moreover, "[f]actual disputes regarding a single factor" of a likelihood of confusion analysis "are insufficient" to support the denial of summary judgment "unless they tilt the entire balance in favor of such a finding." *ZW USA*, 889 F.3d at 446 (quotation omitted).

## A.    Uncontested Ownership of Federally Registered Marks

As a threshold matter, the Court observes that, under the Lanham Act, registration of a trademark is prima facie evidence of the validity of the registration, the registrant's ownership of the mark, and the registrant's exclusive right to use the mark in commerce in

connection with the goods or services specified in the certificate of registration.  *See* 15 U.S.C. § 1057(b).  "However, a mark's registered status is only an evidentiary tool, and the fact of registration does not affect the plaintiff's ultimate burden of proof in an infringement action."  *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626 (8th Cir. 1987).

In this case, Capital does not contest that Global owns the two federally registered Fawn Marks or that they are registered for use with the product "rice."  Instead, the parties' dispute focusses on whether a consumer could confuse the parties' products.

### B.    Likelihood of Confusion

As explained below, the Court concludes that there is no genuine dispute of material fact as to any of the *SquirtCo* factors and that the balance of the factors favors Capital as a matter of law.

### i.    Strength of the Fawn Marks

The Court turns first to the "strength of the owner's mark" factor.  *ZW USA*, 889 F.3d at 446.  When examining the likelihood of consumer confusion, "a strong and distinctive mark is entitled to greater protection than a weak or commonplace one."  *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 947 (8th Cir. 2023) (quotation omitted).  There are two "relevant measurements of a mark's strength": "conceptual strength" and "commercial strength."  *ZW USA*, 889 F.3d at 446 (quotation omitted).  Conceptually, a mark may be "(1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful," with conceptual strength on a sliding scale from unprotectable (generic) to strong (arbitrary or fanciful)."  *Frosty Treats*, 426 F.3d at 1004.

A plaintiff may demonstrate commercial strength by introducing consumer surveys or consumer testimony to demonstrate that its marks enjoy strong secondary meaning. *Lovely Skin, Inc. v. Ishtar Skin Care Prods., LLC*, 745 F.3d 877, 888 (8th Cir. 2014). A plaintiff may also offer evidence regarding the amount of money a company has spent on advertising as "circumstantial evidence of commercial strength," but such evidence is of less value because it "says little about 'minds of consumers,' which is the relevant unit of analysis for likelihood of confusion." *H&R Block, Inc.*, 58 F.4th at 947 (quotation omitted). On the other hand, "evidence of third party usage of similar marks on similar goods is admissible and relevant to show that the mark is relatively weak and entitled to a narrower scope of protection." *Gen. Mills, Inc.*, 824 F.2d at 626–27; *Am. Dairy Queen Corp. v. W.B. Mason Co.*, No. 18-CV-693 (SRN/ECW), 2022 WL 2760024, at *61 (D. Minn. July 14, 2022) (finding that third-party use of mark weakens its conceptual strength "to some degree"); *McKee Baking Co. v. Interstate Brands Corp.*, 738 F. Supp. 1272, 1275 (E.D. Mo. 1990) (finding that although the plaintiff's mark was arbitrary, it was "somewhat weakened by the other uses of such similar marks").

Capital disputes commercial strength, arguing that Global has "provided no direct evidence" that the Fawn Marks are well known and that they are weak because of widespread use of similar marks with a deer or similar animal on packaging for rice.[5] (Doc. No. 131 at 10–19.) The Court agrees with both arguments.

---

[5] Capital does not address the conceptual strength of the Fawn Marks. Evidence in the record could support a finding that there is no conceptual connection between deer and rice. (*See* Z. Bakhtari Decl. ¶¶ 27, 30.) Thus, the Fawn Marks are conceptually strong.

First, Global has not presented admissible direct evidence to show commercial strength. Crucially, Global offers no survey to show the strength of the mark in the minds of consumers. Instead, Global primarily points to the declarations of several store owners or distributors who speculate as to what their customers may think or what brand their customers might associate with a deer or a goat. (*See* Doc. No. 138 at 3 ¶¶ 8–9; Doc. No. 139 at 5 ¶¶ 8–9; Doc. No. 140 at 4 ¶¶ 9–10; Doc. No. 141 at 6 ¶ 8; Doc. No. 142 at 5 ¶ 9.) Capital challenges the admissibility of these statements. (Doc. No. 131 at 14–15.) Although Global asserts that the store owners and distributors offer these statements "based on their own perceptions and decisions," Global cites no legal authority for the general proposition that store owners or distributors have knowledge of their consumers' beliefs. (*See* Doc. No. 135 at 37.) Nor does Global offer any explanation for the conclusory opinions of the store owners and distributors concerning their customers' beliefs. Further, the statements themselves contain no description of particular instances of customer confusion, and they make no attempt to quantify how many customers expressed confusion or state how often this may have occurred. Therefore, these conclusory opinions generalizing the beliefs of unidentified customers amount to inadmissible speculation; the Court therefore disregards them.[6] *Duluth News-Trib.*, 84 F.3d at 1098; *see also Cross*

---

[6] To the extent that the store owners' and distributors' conclusions are themselves based on actual (although unspecified) statements made by customers (although those customers are not described or identified in any way), such statements also constitute inadmissible hearsay, and the Court disregards them for purposes of determining the *SquirtCo* factors on this basis as well.

*Trailers, Inc. v. Cross Trailer Mfg. & Sales, LLC*, 363 F. Supp. 3d 774, 785–86 (W.D. Tex. 2018) (disregarding certain declaration statements and a log about conversations with customers as inadmissible hearsay).

The record is not completely void of admissible evidence concerning the strength of Global's marks, but this evidence is insufficient to support a reasonable juror's finding in Global's favor. For example, three declarants belatedly clarified that they themselves associate the deer on the AAHU BARAH bag with Global. (Doc. No. 139 at 2 ¶ 6; Doc. No. 140 at 2 ¶ 11; 141 at 2 ¶ 6.) The record also reflects some circumstantial evidence about the length of Global's use of the Fawn Marks, its advertising and promotional efforts for its AAHU BARAH and other brands of rice, and third-party media recognition for the AAHU BARAH brand. (*See* Doc. No. 135 at 19–21 (citing Z. Bakhtari Decl. ¶¶ 12–14, N. Bakhtari Decl. ¶¶ 5–22 & Exs. 57 & 58 [Doc. No. 136-1]).) The Court has carefully reviewed the cited evidence and finds that, even construed favorably, it is of limited value in establishing commercial strength, because it lacks context as to the scope of Global's advertising and promotional efforts, and many of the cited promotions do not show a focus on the *Fawn Marks* specifically as opposed to the AAHU BARAH brand generally.[7] For

---

[7]   *See, e.g.*, *Aahu Barah Rice Commercial*, OrangeOakPlus, https://www.youtube.com/watch?v=J5pjnmtGbO4 (displaying the total packaging with no particular focus on the Fawn Marks); *Perfect Instant Pot Basmati Rice*, myheartbeets.com, https://myheartbeets.com/perfect-instant-pot-basmati-rice/ (same and linking to Amazon order page for Aahu Barah rice) (last viewed April 8, 2026); *Anbar Rice by Aahu Barah Commercial*, Aahu Barah, https://www.youtube.com/watch?v=ZzfCl0YVPTA (promoting Anbar rice, by AAHU BARAH). (*See* N. Bakhtari Decl. at 5–7.) Further, at least one of the links does not, upon recent review, show any reference to AAHU BARAH or the Fawn marks. (*See* N. Bakhtari Decl. at 6 (citing *Lamb Ghouzi*, MarthaStewart.com,

instance, Global emphasizes an article featuring a Somali chef in the Twin Cities who cited

AAHU BARAH as his preferred rice. (Doc. No. 136-1 at 161–62.) The chef, however,

makes no reference to the Fawn Marks, referring to the rice by name as "Aahu Barah." (*Id.*

at 162.) Global also cites an Instagram post that suggests that a third-party is selling a shirt

with a design that looks similar to the AAHU BARAH bag label, including one of the Fawn

Marks. (*Id.* at 175.) Again, this exhibit does not show that consumers of rice affiliate the

Fawn Marks with Global, which is the relevant point for purposes of demonstrating the

strength of the marks. Therefore, this limited evidence at most amount to *de minimis*

support for a finding of that the Fawn Marks have some commercial strength, and they

provide no insight into the "minds of consumers" concerning their familiarity with the

Fawn Marks as an indication of source. *H&R Block, Inc.*, 58 F.4th at 947.

Second, the evidence in the record includes ample and uncontroverted evidence of

third-party uses of similar animal marks in the market, which significantly undermines the

strength of the Fawn Marks. Capital offers evidence of basmati rice being sold in the

market with marks depicting four-legged, hooved animals, including the following:

---

https://www.marthastewart.com/349682/lamb-shanks-rice-and-fava-beans (last viewed
April 8, 2026)).)

Notably, Global did not discuss any particular links in its brief. Global has the
obligation to highlight particular facts in the record upon which it relies. *Brown v. City of
Jacksonville*, 711 F.3d 883, 888 n.5 (8th Cir. 2013). The Court thus provides here just a
sampling of the links included in the cited paragraphs of the Nazima Bakhtari Declaration.

| | | | |
|---|---|---|---|
| A leaping deer (Deer brand) (Doc. No. 129-1 at 14, 54): |  | A standing goat (Amina brand) (*id.* at 40): |  |
| Two leaping deer (Asli brand) (*id.* at 43, 52): |  | A standing camel with a leaping deer (Mr. King brand) (*id.* at 45): |  |
| A deer being chased by a tiger (Dreamland Trading brand) (*id.* at 46): |  | A frontal view of a deer (Golden Deer brand) (*id.* at 48): |  |
| A leaping deer (KSN Golden Deer brand) (*id.* at 49): |  | A standing camel (Sarban brand) (*id.* at 50): |  |

16

| A leaping deer (Raheef brand) (*id.* at 55): |  | A running or leaping deer (Mawassem brand) (*id.* at 56): |  |
| --- | --- | --- | --- |

Capital submitted declaration testimony by Osman that the photographed products "are available in the market" (Doc. No. 129 ¶¶ 4–5), and that he had "recently bought several packages of rice with similar packaging," referring to a photograph that shows bags of, among others, the Deer and Dreamland rice shown above (Doc. No. 159 ¶ 10).

Global argues that there is a genuine dispute as to whether these third-party marks are actually used in the relevant market. (Doc. No. 135 at 27–28.) Global argues that Osman's declaration does not lay adequate foundation for his statement that the bags depicted in the exhibits are available in the market. Osman's supplemental declaration provides more foundation (Doc. No. 159 ¶ 4), and the Court concludes that he will be able to lay foundation, so the evidence may be considered at summary judgment. *See* Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment. Global then argues that Osman's deposition testimony contradicts his declaration statement that these products are available on the market. However, Osman specifically testified that he remembered seeing certain brands with deer-like marks (Asli, Deer, Sarago, and Dreamland) in stores, including Dreamland and Asli rice at a store called DurDur, and Asli and Deer rice at a store called Little India. (Doc. No. 144 at 115:10–116:4.) Global also points to the

17

declarations of Nazima and Billal Bakhtari, who state that "Global is not aware of any of Osman's alleged third party uses *pre-dating* Global's adoption of the Global Marks," that Global has taken or will take issue with some of these third-parties' marks (*i.e.*, Amina and Asli), that they cannot find information about some of these marks, and that some of these products are not sold on Amazon, Walmart.com, or eBay.  (Doc. No. 136 ¶¶ 23–38 (emphasis added); Doc. No. 137 ¶¶ 4–5 (stating that *"[o]ther than* as discussed in the declaration of my sister, Nazifa Bakhtari, I am unaware of these products"* (emphasis added).)  None of these statements directly contradict Osman's statements that these products are being sold in this packaging in the market.[8]  There is no genuine issue of material fact that multiple third parties are selling rice, including basmati rice, in packaging that prominently displays deer or deer-like animals.

It is true that the context of the third-party usage matters.  *See, e.g.*, *Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.)*, 544 F.2d 1167, 1173 (2d Cir. 1976).  Here, however, the sheer number of third-party deer or deer-like marks on rice bags that are in the record, supported by testimony that these products are being sold in the market, is enough to weaken the strength of the Fawn Marks considerably.

For these reasons, the Court concludes that a reasonable jury could find that the Fawn Marks are of little strength, and the evidence does not support a finding in Global's favor concerning this *SquirtCo* factor.

---

[8] Further, the record shows Deer brand rice being sold on Amazon.com.  (*See* Doc. No. 129-1 at 14.)

### ii.      The similarity between the Marks

The Court next considers the second *SquirtCo* factor—the similarity between Global's marks and Capital's mark. *ZW USA*, 889 F.3d at 446. As explained below, the Court concludes that no reasonable juror could find that the marks are so similar as to support Global's claim of infringement.

In assessing the similarity of the marks at issue, the Court should consider the "overall impression" of the marks, including considering the "similarities of sight, sound, and meaning" and such features as color schemes, lettering styles, and packaging designs. *See Gen. Mills, Inc.*, 824 F.2d at 627. Having "identical, even dominant" features in common does not "automatically mean that the marks are similar." *Id.* Moreover, the prominent display of "house marks" or source-identifying features can affect the overall impression of the two marks and whether they are similar. *See id.*; *Am. Dairy Queen Corp.*, 2022 WL 2760024, at *65 (finding the identical word marks dissimilar in part because "both logos contain sufficiently prominent verbal house marks"); *Microware Sys. Corp. v. Apple Computer, Inc.*, 126 F. Supp. 2d 1207, 1214 (S.D. Iowa 2000), *aff'd*, 238 F.3d 989 (8th Cir. 2001) (finding the plaintiff was unlikely to succeed in proving a likelihood of confusion between the word marks "MAC OS 9" and "OS-9" in part because the overall packaging was different and both parties' packaging prominently displayed a source-identifying logo such as the Apple corporate logo). The display of a house mark on the product is a factor to be considered but is "not determinative." *Vitek Sys., Inc. v. Abbott Lab'ys*, 675 F.2d 190, 193 (8th Cir. 1982).

19

In this case, the Fawn Marks and Impala Mark are not similar. Other than the fact that both marks display deer-like animals, the similarities stop there. Global's marks are stylistic, while Capital's is more of a realistic and detailed rendering. Global's deer are leaping and stretched horizontally, whereas Capital's animal is standing upright and takes more space vertically. Notably, Capital's mark also has a completely distinct feature: a red partial heart placed above the animal. Equally significant is that consumers typically view these marks in the context of rice bags that prominently display the "house mark," either "AAHU BARAH" or "Al Afia," and also prominently display at the bottom of the packaging the actual source of the product in large type: Global or Capital, with their addresses and contact information spelled out. (*See* Doc. No. 129-1 at 2.) Indeed, one of the registered Fawn Marks even includes AAHU BARAH in the mark. "These distinctions appear to be sufficient to notify an ordinary customer that the [rice products] originate from two different" sources. *Duluth News-Trib.*, 84 F.3d at 1097.

No reasonable juror, viewing these marks' overall impression and the context in which they are typically perceived, could find these marks to be similar. The record of third-party uses of deer-like marks further bolsters this conclusion, as consumers are more likely to notice even "slight differences" between the marks. *Am. Dairy Queen Corp.*, 2022 WL 2760024, at *57.

### iii.   *Degree of competition*

The parties also dispute the third *SquirtCo* factor—the degree to which the parties' rice products compete with one another. *ZW USA*, 889 F.3d at 446. Because the evidence in the record shows that the products directly compete in a one market, even though they

are intended for different specific markets, the Court concludes that a reasonable juror could find this factor slightly favors Global.

The parties agree as to the law: where products directly compete, confusion may be more likely. *ZW USA, Inc.*, 889 F.3d at 448. The plaintiff, however, must still present evidence from which a jury could infer that consumers are likely to be confused as to source. *Id.*

As to the facts, the record evidence shows that both parties' at-issue marks are associated with basmati rice, and that the products directly compete in at least one market. Osman's declaration shows that Capital markets Al Afia rice specifically to the Somali community in Minnesota and surrounding communities. (Doc. No. 131 at 23; *see also* Doc. No. 129-1 at 6 ¶ 7 (stating that "Al Afia rice for the Somali market").) Capital claims there is no evidence that the parties' sales outlets overlap, but as Global notes, Osman's own deposition testimony includes some statements to the contrary.[9] (*See* Doc. No. 144 at 112:19–114:10 (testifying that the following stores or distributors sold both Al Afia and AAHU BARAH rice: DurDur, Holy Land, Little India, Mogadishu Market, Bloomington Market, Minnesota Halal, Seward Market, and Discount Market)). Moreover, Global cites declaration testimony that it has long marketed and sold its AAHU BARAH rice to "the Middle Asian and African communities" (Z. Bakhtari Decl. ¶ 23), and emphasizes the

---

[9] Global also argues that some of the third-party declarations establish that Capital either sells or tried to sell Al Afia rice to stores or distributors that carry AAHU BARAH. (Doc. No. 135 at 33.) Osman contests these accounts. (Doc. No. 159 ¶ 12.) This factual dispute is not material.

article referring to a Minnesotan Somali chef's preference for AAHU BARAH rice (Doc. No. 136 ¶ 21). Thus, a reasonable jury could only conclude on this record that the products directly compete in at least some ethnic grocery stores in the Minnesota region.

### iv.    Intent to "pass off"

The Court next considers the fourth *SquirtCo* factor—whether Capital intended to "pass off" its goods as Global's. *ZW USA*, 889 F.3d at 446. While proof of bad intent is not required for success in an infringement or unfair competition claim, "the absence of such intent is a factor to be considered." *Id.* at 447 (citations omitted). Mere "knowledge of another's product and an intent to compete with that product is not equivalent to an intent to mislead and to cause consumer confusion." *Id.* (quotation omitted). The record presented contains no evidence to support a finding in Global's favor on this factor.

Global's arguments rely heavily on this factor. Global first asserts, without record citation, that "Capital sold Aahu Barah rice for about a decade before launching AL AFIA with a deer logo." (Doc. No. 135 at 34.) Capital, through a supplemental Osman declaration, disputes this assertion to some degree. (Doc. No. 159 ¶ 5; *see also* Doc. No. 129-1 at 6 ¶¶ 3–5.) Even if true, familiarity with the AAHU BARAH rice and an intent to compete with it are inadequate to show intent to mislead. *See ZW USA, Inc.*, 889 F.3d at 447. Global also argues that an inference of intent to confuse should be drawn from Capital's launch of the Al Afia product without spending money on marketing or advertising. (Doc. No. 135 at 30.) Even assuming the fact about marketing expenditures is true, given Capital's undisputed focus on word-of-mouth and relational marketing in a

22

relatively narrow market—ethnic grocery stores in and around Minnesota (Doc. No. 129-1 at 10 ¶¶ 32–34)—no reasonable juror could infer an intent to mislead and confuse.

Global also challenges Capital's account of how and why Capital adopted the Al Afia brand and Impala Mark. (Doc. No. 135 at 7–12, 28–30.) Before the TTAB, Capital submitted declaration testimony by Osman about his selection of an impala for the Al Afia mark because of the American Somali refugee community's positive affinity for the impala and his inclusion of the "heart element" in the mark "to indicate good health." (*See* Doc. No. 129-1 ¶¶ 12–17.) Global attacks Osman's credibility by pointing to what it contends are inconsistencies. For instance, Global asserts that Osman has given inconsistent or unsupported accounts about using a graphic designer to design the Impala Mark and what direction he gave the designer. (*Id.* at 34.)

The Court does not find any material inconsistencies. Indeed, Global presented many of these facts to Magistrate Judge Foster in connection with a motion to amend, and the Magistrate Judge found that they were not material inconsistencies. (Doc. No. 106 at 24–25 (discussing allegations that "Osman lied when he says choice of trademark was influenced by Somali culture because he chose the logo from a bunch of options that a graphic designer presented" and finding no material misrepresentation or inconsistency).) Global did not object to that finding. The Court likewise finds that Global has not shown any material inconsistencies in Osman's account of the design and selection of the Impala Mark. For instance, even if, as Global contends, Osman or a designer selected a stock-art image and used it to depict an impala, and even if that stock-art image is called "roe deer" on one website, that fact is not materially inconsistent with Capital's believing the image

23

looks like an impala and that an impala calls to mind the Garissa County flag with which Somali-Americans would be familiar. Similarly, even accepting as true that Osman or a designer copied the heart element of the Impala Mark from a mark used in Saudi Arabia, that fact would not be materially inconsistent with Capital's adding a heart to allude to health.

Although the Court must "accept as true the nonmoving party's account of the facts where there are material inconsistencies," *Guite v. Wright*, 147 F.3d 747, 749 (8th Cir. 1998), Global has not demonstrated any material inconsistencies in Osman's account. Therefore, Global fails to raise a genuine dispute of material fact as to Capital's intent in selecting the Impala Mark. The absence of proof of bad intent weighs in Capital's favor. *ZW USA, Inc.*, 889 F.3d at 447 (stating that "the absence of such intent is a factor to be considered").

### v. *Incidents of actual confusion*

Next, the Court considers whether there is evidence of incidents of actual confusion. *ZW USA*, 889 F.3d at 446. Actual incidents of confusion are "proof of the likelihood of confusion," but a "plaintiff is not required to bring forth incidents of actual confusion to succeed in an infringement case." *Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 768 (8th Cir. 2010). In analyzing this factor, weight is given to the "number and extent of instances of actual confusion." *Id.* (quotation omitted). Again, the Court concludes that no reasonable juror could find that this factor favors Global.

Global argues that the record contains two types of evidence of actual confusion: the series of third-party declarations produced by Global and a survey on the issue of

24

likelihood of confusion by Global's expert Hal Poret.  Capital argues that neither creates a genuine issue of material fact.  The Court agrees with Capital.

Global offers declarations of five people as providing evidence of actual confusion. Of the five declarants, only three say they have been personally confused.  Nadim Azimi and Khalid Darab are store owners in Virginia who both state that "a sales representative for AL AFIA rice came into my store offering for me to purchase AL AFIA rice," that "[w]hen I first saw the AL AFIA package, I thought it was another offering from AAHU BARAH rice" because of the "deer on the package and because their layout and color schemes look very similar," and that "[w]hen I spoke to the sales representative and realized that the AL AFIA rice was not affiliated with AAHU BARAH rice, I chose not to sell it in my store."  (Doc. No. 139 at 5 ¶¶ 4–7; Doc. No. 141 at 5 ¶¶ 4–7.)  Only one declarant, Wafaa Alrawahneh, a store owner in Ohio, actually purchased Al Afia rice, thinking that it "was another offering from AAHU BARAH rice."  (Doc. No. 138 at 3 ¶¶ 4– 5.)  Alrawahneh claims that he then "noticed customers confusing the Al AFIA rice for the Aahu Barah Rice" and offers that "[t]he reasons customers thought that AL AFIA rice was affiliated with AAHU BARAH rice were because they both have a deer on the package and because their layout and color schemes look very similar."  (*Id.* ¶¶ 6–7.)  Alrawahneh gives no specific examples of incidents of customer confusion and does not cite any conversations that would inform his statements about customers' confusion or why they were confused.  Finally, two additional declarants do not claim they personally have been confused or even that they have perceived customer confusion, instead opining that they

believe their customers would or could be confused.[10]  (Doc. No. 140 at 4 ¶ 12 ("I would not sell any rice with a four-legged animal that looks like a deer (or goat) on the bag other than the AAHU BARAH rice because I believe my customers would confuse it with AAHU BARAH rice."); Doc. No. 142 at 2 ¶ 7 ("Based on my experience, the Al Afia deer image would be confused by my customers as coming from Global. Customers looking for a rice with a deer image could mistake the Al Afia rice as Global's due to the deer on its label.").)

Even accepting the declared facts as true, these declarations are, at best, *de minimis* evidence of actual confusion.  Crediting, for purposes of summary judgment, Azimi and Darab's statements that they were initially confused, these two single instances of confusion did not lead to any sale of Al Afia rice.  Global's theory in this case is not initial interest confusion.  That leaves Alrawahneh, and while he attests to his own confusion, his broad statements about his customers being confused are either speculation or, to the extent he is characterizing unspecified conversations with unnamed customers, hearsay.[11] Global's declarations thus show *de minimis* actual confusion and fail to raise a genuine factual dispute.  *See Duluth News-Trib.,* 84 F.3d at 1098.

----

[10] One declarant also states, "I can say with full confidence that Al Afia rice has been confused with AAHU BARAH because of the similar packaging and deer animal on the bag."  (Doc. No. 142 at 6 ¶ 13.)  However, the Court gives this statement little weight because it is conclusory, lacks any detail, and is speculative.

[11] Both Azimi and Darab also explained that they thought their "customers, like [them], would confuse the AL AFIA rice with AAHU BARAH rice."  (Doc. No. 139 at 5 ¶ 6; Doc. No. 140 at 5 ¶ 6.)  They do not provide any basis for these speculative statements.

Global's reliance on the Poret survey (Doc. No. 132-2) fares no better. The Poret survey tested for confusion as between Global's "unregistered Bag Design Mark" and Capital's bag, not specifically as to confusion between the Fawn Marks and Impala Mark. (*See* Doc. No. 132-2 at 5 & n.2 (explaining that Global asserts "a common law infringement claim (Count IV) alleging that the Al Afia product's use of a fawn design and other features similar to the Aahu Barah bag creates a likelihood of confusion with respect to Global's rights in its mark *embodied in the design of the Aahu Barah bag (the Bag Design Mark)*" (emphasis added).) Poret's report states that he was retained "to design and conduct a survey to test the extent to which, if at all, the similarity of the Al Afia *bag design* to the Aahu Barah *Bag Design* Mark creates a likelihood of confusion." (*Id.* at 6 (emphasis added).)

At oral argument on the motion for summary judgment, Global asserted that it still has viable claims in its bag design, citing claims for unregistered trademarks in Counts 3 and 4. (Doc. No. 190 at 32–34.) This argument lacks merit. In response to Global's shifting theories and terminology, the Court's orders clearly dismissed Global's claims as to its trade dress, packaging, bag design, and/or bag label and denied leave to amend. (Doc. Nos. 169, 183, 186.) Global's remaining claims in this case pertain to its Fawn Marks. The Poret survey is not evidence of actual confusion between the Fawn Marks and Impala Mark because it was not designed to measure likelihood of confusion between them. *See, e.g.*, *Georgia-Pac. Consumer Prods. LP v. Myers Supply, Inc.*, 621 F.3d 771, 776 (8th Cir. 2010) (declining to credit testimony of expert regarding likelihood-of-confusion survey where "the entire premise of the survey was flawed").

27

Therefore, given the absence of anything other than *de minimis* confusion in the record, despite these products' being sold in at least some of the same stores for at least some period of time, a reasonable juror would necessarily conclude that this factor heavily favors Capital.

### vi.    *Degree of care exercised by consumer*

Finally, under *SquirtCo*, the Court considers the nature and product. *ZW USA*, 889 F.3d at 446. The parties agree that consumers of basmati rice exercise ordinary care in making their purchases but otherwise do not develop an argument on this factor. (Doc. No. 135 at 30; Doc. No. 156 at 3.) The Court concludes that this factor is neutral.

### vii.    *Conclusion*

On this record, Capital has shown there is no genuine issue of material fact and it is entitled as a matter of law to a determination that Global cannot show a likelihood of confusion between its Fawn Marks and the Impala Mark. The dissimilarities between these marks and the lack of more than *de minimis* actual confusion between the marks weigh heavily against a likelihood of confusion, especially considering that the marks typically are viewed on a bag that prominently displays the AAHU BARAH or Al Afia name above and the source of product (Global or Capital) below the marks. The evidence of similar third-party marks depicting deer or deer-like animals on rice bags further compels the conclusion, as does the lack of evidence of an intent to pass off. Even though the AAHU BARAH Fawn Marks are moderately strong, no reasonable juror could find a likelihood of confusion in light of these other factors.

28

Therefore, the Court grants summary judgment to Capital on the merits of all of Global's remaining claims.[12]

### C.    Lost-Profit Damages

Capital argues that on this record, Global can neither prove actual damages nor the requisite causal link between its conduct and any alleged lost profits.  The Court agrees.

A plaintiff may recover an award of its damages for Lanham Act violations under 15 U.S.C. § 1117.  To recover damages for trademark infringement, "[a] plaintiff must prove both actual damages and a causal link between defendant's violation and those damages." *Rhone-Poulenc Rorer Pharms., Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511, 515 (8th Cir. 1996).  Capital contends that Global has produced no evidence of actual loss. Global's 30(b)(6) corporate representative testified that Global was not aware of evidence that the alleged infringement had caused Plaintiff to lose money or any sales.[13]  (Doc. No. 133-2 at 53:10–54:14.)  Global fails to rebut this argument.

Further, Capital argues that Global has failed to show causation, meaning that any lost profits (if proven) were the result of Capital's infringement.  Fatally, Global's damages

---

[12] The Court in its discretion declines to decide summary judgment on the basis of Global's various procedural arguments based on the Local Rules and this Court's Practice Pointers. (*See* Doc. No. 135 at 47–49.)

[13] Global purported to correct this testimony in an errata sheet, adding the following statement: "At this time, Global states that Global's sales history in MN and see that there has been a decrease after AL AFIA entered the market" (*sic*).  (Doc. No. 133-2 at 231.) Setting aside whether such substantive edits are proper, Global's self-serving edited statement is too general to create a genuine issue of material fact.

expert Rebecca Fitzhugh admitted that she could not quantify lost profits "due to Capital's accused rice." (Doc. No. 133-4 ¶ 49.)

Thus, Global cannot prove lost profits.[14] *See Blue Dane Simmental Corp. v. Am. Simmental Ass'n*, 178 F.3d 1035, 1043 (8th Cir. 1999) (finding that where the only "evidence of damages was plaintiffs' testimony that they believed that their sales had dropped because of the introduction of the [defendant's] animals into the [relevant] market," plaintiffs had failed to show that defendant "caused them damages under . . . the Lanham Act"). The Court therefore independently grants summary judgment to Capital on Global's claim to an award of its lost profits.

### D.    Request for Attorney Fees and Costs

Capital seeks an award of its attorney fees and costs. Under 15 U.S.C. § 1117(a), attorney fees may be awarded to the prevailing party in "exceptional cases." An exceptional case is "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Safeway Transit LLC v. Disc. Party Bus, Inc.*, 954 F.3d 1171, 1182 (8th Cir. 2020) (quoting *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)). A party's unreasonable conduct need not be independently sanctionable for the case to be exceptional. *Pocket Plus, LLC v. Pike Brands, LLC*, 53 F.4th 425, 435 (8th Cir. 2022) (citation omitted). Finally, courts may also

---

[14] Global argues that it is entitled to seek disgorgement of Capital's profits (Doc. No. 135 at 44–45), but Capital's motion does not challenge Global's request for disgorgement.

consider the prevailing party's behavior in declining to award attorney fees in exceptional cases. *Id.*

Capital argues that this case is exceptional because Global produced a third-party declaration that the declarant later withdraw as untrue and based on Global's "vexatious pursuit" of its trade dress claim. (Doc. No. 131 at 43–47.) Global opposes the request, raising its own accusations surrounding the third-party declarants and noting that Capital had filed a discovery motion that was largely denied. (Doc. No. 135 at 46–47.)

The Court declines to award attorney fees in this action pursuant to section 1117(a). This case has been hard-fought on both sides, with varying degrees of success on different motions, and the parties have, unfortunately, levied accusations of misconduct at one another. The Court, including the Magistrate Judge, has considered requests for an award of fees at various points in this litigation and denied them. (*See* Doc. Nos. 91, 183.) The Court again declines, at this point, to order the exceptional relief of a fee award. The Court observes, however, that despite the clear import of the Court's orders (*see* Doc. Nos. 43, 169, 183, 186), Global continues to press its shifting claims for its bag label, bag design, packaging, or trade dress, both in this case and in a second, later-filed lawsuit (*see, e.g.*, Doc. No. 187; Doc. No. 190 at 32–33; Doc. No. 191). The Court does not prejudge how it might respond to a future fee award request by Capital.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.      Defendants Capital Distributors LLC and Capital Imports, LLC's Motion for

31

Summary Judgment (Doc. No. 128) is GRANTED in part and DENIED in part, as follows:

    a.    Summary judgment on Plaintiff Global Commodities, Inc.'s Complaint (Doc. No. 1) is GRANTED in favor of Defendants Capital Distributors LLC and Capital Imports, LLC.

    b.    Defendants Capital Distributors LLC and Capital Imports, LLC's request for an award of attorney fees and costs is DENIED.[15]

2.    Defendants Capital Distributors LLC and Capital Imports, LLC's Motion to Strike and Exclude Undisclosed Evidence (Doc. No. 160) is DENIED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  April 10, 2026                          /s/ *Jeffrey M. Bryan*
                                           Judge Jeffrey M. Bryan
                                           United States District Court

---

[15] This denial is without prejudice to any request made pursuant to Federal Rule of Civil Procedure 54(d)(1) and D. Minn. L.R. 54.3(c).